UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAQUAN L. MALDONADO,<br><br>Petitioner,<br><br>v.<br><br>SCOTT FRAUENHEIM,<br><br>Respondent. | Case No.  15-cv-03002-EMC<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

## I.    INTRODUCTION

Taquan L. Maldonado filed this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 to challenge his state court conviction for first degree murder.  Respondent has filed an answer to the petition and Mr. Maldonado has filed a traverse.  For the reasons discussed below, the Court denies the petition.

## II.    BACKGROUND

The California Court of Appeal described the evidence at trial:

> [The decedent, Katrina] Moore began dating appellant in 2009. Moore was 10 years younger than appellant and had been previously married. Moore lived in a house on Eden Canyon Road (the house) in Castro Valley with several people, including Stephen Wilson, Japhy Frey, and Lacey Elletson. Appellant did not live at the house, but he frequently spent the night there with Moore. Everyone who lived or spent the night at the house used methamphetamine.
>
> When appellant and Moore began dating, they "got along" and had a "normal" relationship. At some point, however, the relationship changed and they began to argue frequently, sometimes once or twice a day. Wilson, Frey, and Elletson heard appellant and Moore arguing in Moore's bedroom; sometimes Frey heard "stuff crashing ... loud bangs, doors slamming, that kind of thing." Appellant also called Moore constantly and left her threatening voicemails, sometimes saying, "'I know you're there'" and "'Pick up the phone.'" Some messages were angry, others were "whiny" and

"[m]ushy." Appellant also came to the house uninvited, once stealing a car to drive there.

In March 2010, Moore's father saw she had a black eye; Moore said she "got in a fight with" appellant but claimed "it was an accident, it was no big deal ... really downplaying it." When Moore's father confronted appellant and asked him, "'What did you hit her for?'" appellant looked away and did not respond. When Moore's father encouraged Moore to break up with appellant, she said "they were breaking up, or they were broke[n] up."

In early April 2010, Elletson saw Moore with a black eye. Moore told Elletson she had "gotten into a confrontation[.]" Moore did not want to be seen at work with a black eye, so she stopped going and was fired. Later that month, Elletson heard appellant and Moore fighting in Moore's bedroom. Elletson heard a smack and saw Moore holding her face; Moore told Elletson appellant "put [his] hands on her." In April 2010, Moore complained to Frey that her back hurt: she said appellant "'punched [her] in the back'" and showed Frey a bruise the size of a grapefruit on her back.

In late April or early May 2010, Moore told Frey she was "trying to break up with" appellant but she continued to see him regularly. Elletson thought Moore was confused about whether to continue dating appellant; as Elletson explained, "she was not wanting to be with him but she didn't know how to tell him ... that she was done [with the relationship], and he wasn't getting the point." Around this same time, Moore spoke with her ex-husband about "getting back together" and moving to Sacramento. Moore and Wilson had intimate relations "a few times" in April or May 2010.

In May 2010—a few weeks before her death—Moore had a bloody lip after dropping appellant off at his house. She was crying and upset: she told Wilson appellant punched out the back passenger window of her car and "threw her phone at her." The next day, Frey saw appellant with a bandage over a cut on his hand. Appellant admitted he punched the window because he was angry.

Around this time, Moore became pregnant. She told Elletson she felt like she "had this demon in her" and wanted to terminate the pregnancy. On June 1, 2010, [Moore] and Elletson went to a clinic to fill out paperwork for Moore to get an abortion. Moore scheduled the abortion for June 3, 2010. Appellant spent the night at Moore's house on June 2, 2010. On the morning of June 3, 2010, the two women drove to Moore's house to pick up appellant. Appellant told Moore he loved her. As the car drove away, Wilson saw appellant throw a knife out the car window and onto the driveway. Wilson picked up the knife—which he thought was from Moore's kitchen—and put it in his bedroom.

On Thursday, June 3, 2010, Moore went to the clinic to have an abortion. Elletson accompanied her. On the way to the clinic, they stopped at appellant's house; Elletson waited in the car while Moore "went up to the door" to talk to appellant. Elletson heard appellant and Moore arguing about the abortion: appellant said "he was going to support [Moore] and the baby [.]" Moore returned to the "car

**United States District Court**
For the Northern District of California

crying and jump[ed] in" and appellant "started chasing the car" as Moore drove away. As they drove, appellant called Moore and yelled at her for "murdering his kid[.]" Moore had the abortion that afternoon; appellant called and harassed her that evening.

On June 4, 2010, Moore drove appellant to jail, where he was to serve time for a car theft conviction. Moore told Wilson the jail was "overbooked." She and appellant returned to the house and appellant spent the night. Wilson did not hear appellant and Moore arguing that evening. The next morning, June 5, 2010, Wilson saw appellant and Moore making breakfast. Moore "seemed fine." Wilson went outside to work in the yard. At some point, Wilson heard appellant and Moore arguing inside the house. Wilson heard a loud "thud ... come from the house[,]" like a body or something heavy hitting the floor. He went to Moore's bedroom, where he heard Moore and appellant talking in "calm voice[s]." Wilson thought appellant was "saying something about you always got to bring up something old" and that he wanted to "start fresh[.]" Wilson went outside and resumed his yard work.

About 15 minutes later, appellant ran outside and said, "'Help me help her.'" Appellant had blood on his elbow. He said Moore fell through a window. Wilson went into the house and saw blood on the archway leading into the living room. Appellant went into Moore's bedroom and shut the door. Wilson did not go into the bedroom; instead, he looked for a phone to call 911. As Wilson looked for a phone, he heard appellant say Moore was "swallowing her tongue, and something about the broken window." Unable to find a working telephone, Wilson went to a neighbor's house to borrow a phone.

Appellant called 911 from a phone in Moore's bedroom and said he needed an ambulance for his girlfriend, who was "stabbed right below her collar bone and her shoulder." When asked, "how did she stab herself" appellant said "Oh my God." He did not respond when asked "who stabbed her or how did she get stabbed?" When asked again who stabbed Moore, appellant said, "We were just playing around [in] the room ... and then ... I don't know what happened. We were just playing around. We're just, like, gonna have sex in the room and then she ran into the—into the sliding glass closet." The dispatcher asked appellant, "'Y'all were just playing around and she just ran into the knife or something[?]" and appellant said, "No. No knife, the closet."

Law enforcement officers arrived and found Moore on her bedroom floor, covered in blood. She was "wheezing and gurgling" and appellant was "holding a rag to her shoulder." The room was "very disheveled" and there were "blood streaks on the bedroom door, on the walls, carpets" and on appellant's clothes. A mirrored glass closet door in the bedroom was shattered and there were glass fragments on the floor. Moore had a deep, oozing wound near her neck. The officer felt a "very faint" pulse in Moore's neck and prepared to perform CPR. At that point, paramedics arrived and unsuccessfully performed CPR for a lengthy period of time.

A law enforcement officer took appellant out of the bedroom. His clothes were bloody and he had "a laceration on his left forearm"

3

and red marks on his arms, face, chest and back. Appellant "was
very excited, hysterical, concerned, distraught" and "kept trying to
go back inside" the house. A law enforcement officer moved
appellant to a patrol car and arrested him.

Some time later, Moore's ex-husband cleaned Moore's bedroom and
found a 9–inch, single blade knife hidden in a floor vent. The knife
was usually in a kitchen drawer, about 20 feet from Moore's
bedroom. The knife had Moore's blood on it and appellant could not
be excluded as the source of a minor DNA profile on the knife. A
forensic pathologist testified Moore's wound was consistent with the
use of the knife found in her bedroom, not from broken glass. The
knife traveled between two ribs, through Moore's left lung, and
close to her heart. The pathologist testified people with this type of
wound can survive for up to 30 minutes, and opined Moore probably
would have survived had she received medical treatment earlier.
Moore had methamphetamine in her system when she died.

Defense Evidence

Appellant's friends and relatives testified appellant loved Moore and
was upset about her decision to have an abortion. Witnesses testified
Moore stalked appellant by repeatedly calling him "[a]ll day, all
night" and by watching him when he was out in public without her.
Witnesses could hear Moore screaming at appellant when she called
and testified she sometimes slapped him when she was angry. They
also testified appellant frequently tried to pacify Moore. Appellant's
ex-wife testified he was not violent during their marital fights, but
conceded she applied for a restraining order after he said he had a
gun in the garage. She also testified appellant threatened "people"
were "going to go down" if she obtained a restraining order.

On cross-examination, appellant's witnesses admitted that when
they spoke to appellant while he was in jail, he said the incident was
an accident. In one conversation, appellant's aunt advised him to tell
the prosecutor Moore got him hooked on methamphetamine, and it
"f- - -ed [his] head up" and "the next thing you know she's dying,
and you didn't even know what happened[.]" In response, appellant
said, "'Yeah, but I don't know if that s- - - will hold in court.'"

*People v. Maldonado*, California Court of Appeal No. A134796, opinion filed April 28, 2014

("Cal. Ct. App. Opinion") at 2-6.

Following the jury trial in Alameda County Superior Court, Mr. Maldonado was convicted

of first degree murder and found to have personally used a deadly and dangerous weapon in the

commission of the offense.  He was sentenced to 26 years to life in prison on February 24, 2012.

Mr. Maldonado appealed.  The California Court of Appeal affirmed his conviction in April

2014, and the California Supreme Court denied his petition for review in August 2014.  Mr.

Maldonado also filed petitions for writ of habeas corpus in the California Court of Appeal and

United States District Court
For the Northern District of California

4

California Supreme Court, which were summarily denied.  Docket No. 13-21; Docket No. 13-22 at 72.  Mr. Maldonado later filed another *pro se* petition for writ of habeas corpus in the California Supreme Court, which was summarily denied.  *See* Docket No. 13-22 at 158.

Mr. Maldonado then filed his federal petition for writ of habeas corpus.  The Court ordered Respondent to show cause why the petition should not be granted.  Respondent has filed an answer to the petition, and Mr. Maldonado has filed a traverse.  The matter is now ready for decision.

### III.   JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this action for a writ of habeas corpus under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the petition concerns the conviction and sentence of a person convicted in Alameda County, California, which is within this judicial district.  28 U.S.C. §§ 84, 2241(d).

### IV.   STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review.  A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if

the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Id.* at 411.  "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'" *Id.* at 409.

The state-court decision to which § 2254(d) applies is the "last reasoned decision" of the state court.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005).  "When there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst*, 501 U.S. at 803.  The presumption that a later summary denial rests on the same reasoning as the earlier reasoned decision is a rebuttable presumption and can be overcome by strong evidence. *Kernan v. Hinojosa*, 136 S. Ct. 1603, 1605-06 (2016).  Although *Ylst* was a procedural default case, the "look through" rule announced there has been extended beyond the context of procedural default and applies to decisions on the merits.  *Barker*, 423 F.3d at 1092 n.3.  In other words, when the last reasoned decision is a decision on the merits, the habeas court can look through later summary denials to apply § 2254(d) to the last reasoned decision.

Section 2254(d) generally applies to unexplained as well as reasoned decisions.  "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  *Harrington v. Richter*, 562 U.S. 86, 99 (2011). When the state court has denied a federal constitutional claim on the merits without explanation, the federal habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court."  *Id.* at 102.

United States District Court
For the Northern District of California

# V.   DISCUSSION

Several of the habeas claims in this action involve the differences between first degree murder and voluntary manslaughter.  In California, the crime of voluntary manslaughter is a lesser included offense of the crime of murder.  *People v. Beltran*, 56 Cal. 4th 935, 942 (2013).

"Murder is the unlawful killing of a human being . . . with malice aforethought."  Cal. Penal Code § 187(a).  Malice aforethought may be express or implied.  *Id.* at § 188.  Express malice is "an intent to kill" and implied malice exists "'when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses.'  A killing with express malice formed willfully, deliberately, and with premeditation constitutes first degree murder."  *Beltran*, 56 Cal. 4th at 941-42 (citation omitted).

"Manslaughter is the unlawful killing of a human being without malice."  Cal. Penal Code § 192.  If the killing without malice is done "upon a sudden quarrel or heat of passion," it is voluntary manslaughter.  *Id.* at § 192(a).  "Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter."  *Beltran*, 56 Cal. 4th at 942.  Voluntary manslaughter based on a heat-of-passion theory has both a subjective and an objective component.  *See People v. Moye*, 47 Cal. 4th 537, 549 (Cal. 2009).  For the subjective component, the defendant must actually, subjectively, kill the victim in the heat of passion, that is, anger, rage, or any violent, intense, high-wrought or enthusiastic emotion, except revenge.  *See People v. Breverman*, 19 Cal. 4th 142, 163 (Cal. 1998).  The objective component requires that the defendant's passion have an objectively reasonable basis.  That is, there must be evidence that the victim provoked the defendant, and that conduct was "sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection."  *Moye*, 47 Cal. 4th at 550.  The provocation need not be such that it would prompt an ordinary person of average disposition to kill someone, but only that it "would render an ordinary person of average disposition 'liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.'"  *Beltran*, 56 Cal. 4th at 957 (quoting *People v. Logan*, 175 Cal. 45, 49 (1917)).

A.      Sufficiency of the Evidence

Mr. Maldonado argues that the evidence was insufficient to support the first degree murder conviction.  He contends that he was guilty of, at most, voluntary manslaughter.  Among other things, he argues that he was "too drugged on methamphetamine" to form the mental state necessary for first degree murder.  Docket No. 6 at 10.

This claim was not presented on direct appeal and was instead presented only in Mr. Maldonado's *pro se* petition for writ of habeas corpus to the California Supreme Court.  Because the California Supreme Court summarily rejected the challenge to the sufficiency of the evidence, the federal habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court."  *Harrington,* 562 U.S. at 102.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  A court reviewing a conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt, but rather determines whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt may a court conclude that the evidence is insufficient.  *See Jackson*, 443 U.S. at 324.  The "prosecution need not affirmatively 'rule out every hypothesis except that of guilt,'" and the reviewing federal court "'faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'"  *Wright v. West*, 505 U.S. 277, 296-97 (1992) (quoting *Jackson*, 443 U.S. at 326).

"*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts

to ultimate facts.'" *Coleman v. Johnson*, 566 U.S. 650, ---, 132 S. Ct. 2060, 2064 (2012) (per curiam) (citing *Jackson*, 443 U.S. at 319).  "[O]n habeas review, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge" unless "the state court decision was objectively unreasonable."  *Id.* at 2062 (internal quotation marks omitted).

The *Jackson* standard is applied to a crime as that crime is defined by state law.  *Jackson*, 443 U.S. at 324 n.16.  Under California law, murder is the unlawful killing of a human being with malice aforethought.  Cal. Penal Code § 187(a).  A murder that is "willful, deliberate, and premeditated" is first degree murder.  *Id.* at § 189.  California courts have identified three common indicators that a killing was deliberate and premeditated: (1) planning activity, (2) motive, and (3) a particular or exacting manner of killing.  *People v. Anderson*, 70 Cal. 2d 15, 27 (Cal. 1968).  The *Anderson* factors are not elements of the crime, and not all three factors need to be present to sustain a finding of premeditation and deliberation.  *People v. Garcia*, 78 Cal. App. 4th 1422, 1427 (2000).  Instead, the *Anderson* factors are guidelines to aid a reviewing court in determining whether the elements of premeditation and deliberation are present, i.e., "whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse."  *People v. Perez*, 2 Cal. 4th 1117, 1125 (1992).

Here, the evidence was sufficient to support the jury's verdict that Mr. Maldonado committed first degree murder.  The identity of the killer was not seriously disputed at trial, and the focus was instead on Mr. Maldonado's mental state at the time Ms. Moore was killed.

All three *Anderson* factors -- planning activity, manner of killing, and motive -- that tend to show deliberation and premeditation were present.  Evidence was presented that Mr. Maldonado had to walk at least 20 feet to the kitchen to retrieve the knife, and walk another 20 feet back to the bedroom, where he stabbed Ms. Moore.  RT 830.  This evidence supported a finding of premeditation and deliberation as it tended to show some planning and time for reflection before the fatal wound was inflicted.  There also was evidence that two days before he killed her, Mr. Maldonado threw a kitchen knife out of the car as he left her home, which supported an inference that he had been thinking about killing her then.  Mr. Maldonado stabbed Ms. Moore with a 9-inch

1  knife that he plunged into her chest, near her heart, to a depth of about 8 inches.  The pathologist

2  testified that a person can survive for up to 30 minutes after being wounded in the manner Ms.

3  Moore was, and that she probably would have survived if she had received medical treatment

4  sooner.  Stabbing her in the general area of her heart and then delaying in seeking help for her --

5  while also taking the time to hide the murder weapon in the floor vent -- supported an inference

6  that Mr. Maldonado acted with a plan and intent that Ms. Moore die.  There was evidence showing

7  a motive for Mr. Maldonado to kill Ms. Moore: Ms. Moore recently had an abortion and was

8  going to leave Mr. Maldonado, RT 519, 572, 616-17, and he was upset by these events.

9       The evidence of prior domestic violence by Mr. Maldonado toward Ms. Moore permitted

10  the jury to conclude that Mr. Maldonado "was disposed or inclined to commit domestic violence

11  and, based on that decision, also conclude that the defendant was likely to commit murder."  CT

12  471 (CALCRIM 852).  That domestic violence evidence included evidence that Mr. Maldonado

13  threw a cell phone at her face, RT 184; gave her a black eye, RT 401-02; punched her in the back,

14  leaving a grapefruit-sized bruise, RT 555-56; and slapped her in the face, RT 642-43.

15       Several items tended to show consciousness of guilt.[1]  Mr. Maldonado hid the knife he

16  used to stab the victim.  And Mr. Maldonado fabricated a story that Ms. Moore was injured by a

17  shard from a mirror she fell into.  Mr. Maldonado offered that version of events to the 9-1-1

18  operator, the police, and his relatives.  It was not until the knife was found two months later that

19  he changed his story.

20       Mr. Maldonado urges that the evidence was insufficient because he "was too drugged on

21  methamphetamine to form" the mental state required for first degree murder.  Docket No. 6 at 10.

22  The evidence of his drug use on the day of the killing was very weak, as Mr. Maldonado did not

23  testify and no physical or medical evidence showed that he had methamphetamine in his system.

24

25  [1] Under California law, a defendant's false or misleading statements relating to the charged crime
26  "may show [a defendant] was aware of his guilt of the crime" and the jury "may consider it in
     determining his guilt."  CT 461 (CALCRIM 362).  Under California law, a defendant's efforts "to
27  hide evidence or discourage someone from testifying against him" or "to create false evidence or
     obtain false testimony" "may show that he was aware of his guilt," and "it is up to [the jury] to
28  decide its meaning and importance.  However, evidence of such an attempt cannot prove guilt by
     itself."  CT 463 (CALCRIM 371).

United States District Court
For the Northern District of California

1    Mr. Maldonado nonetheless urges that there was *some* support for intoxication, as his drug use

2    was "corroborated" by police officer Gary Rodgers' testimony that, upon arriving at the scene of

3    the killing, he (officer Rodgers) found Mr. Maldonado to be very excited, hysterical and

4    distraught.  Mr. Maldonado also notes that officer Rodgers observed some marks on Mr.

5    Maldonado's body (but does not explain how those showed methamphetamine use) and notes that

6    the police found other illegal drugs when they searched Mr. Maldonado.  This evidence does not

7    undermine the sufficiency of the evidence to support the first degree murder conviction.  Mr.

8    Maldonado's symptoms, which he contends were consistent with him being "too drugged on

9    methamphetamine," Docket No. 6 at 10, also were consistent with him being upset about having

10   just killed his girlfriend, having delayed in summoning help, and having hidden the knife he used

11   to stab her.  Because the record supports conflicting inferences, the federal habeas court must

12   presume "that the trier of fact resolved any such conflicts in favor of the prosecution, and must

13   defer to that resolution."  *Jackson,* 443 U.S. at 326.  Even if some evidence -- i.e., the marks on

14   Mr. Maldonado's body, Mr. Maldonado's agitated state, and Mr. Maldonado's possession of other

15   drugs -- suggested that he had consumed drugs, the jury implicitly rejected the inference that he

16   was "too drugged on methamphetamine" to form the mental state necessary for first degree

17   murder.  *Cf. People v. Barnett*, 17 Cal. 4th 1044, 1156 (Cal. 1998) ("By finding defendant guilty

18   of first degree murder, . . . the jury reached the factual conclusion that defendant acted with malice

19   aforethought, deliberation, and premeditation, and necessarily rejected the argument that . . .

20   taking of methamphetamine interfered with his ability to form these requisite mental states.");

21   *People v. Castillo*, 16 Cal. 4th 1009, 1018 (Cal. 1997) (upholding first degree murder conviction

22   where "the evidence of defendant's intoxication was equivocal at best" and defendant "did not

23   claim PCP use until after he first denied any involvement in the crime").

24        Mr. Maldonado also argues that he "had like a dream that Katrina [Moore] was arguing"

25   with him, then chased him with a knife, then they struggled "and during the struggling, Ms. Moore

26   was stabbed."  Docket No. 6 at 10.  But Mr. Maldonado does not dispute that there was absolutely

27   no evidence of this dream presented at trial.  Evidence not presented at trial does not factor into

28   the sufficiency-of-the-evidence analysis.

1     The California Supreme Court's rejection of Mr. Maldonado's due process challenge to the

2     sufficiency of the evidence was not an unreasonable application of, or contrary to, any holding of

3     the U.S. Supreme Court. Mr. Maldonado is not entitled to the writ of habeas corpus on this claim.

4     B.     Refusal To Instruct On Voluntary Intoxication

5            During the discussions of jury instructions, defense counsel requested an instruction on

6     intoxication.  The trial judge determined that there was no evidence that Mr. Maldonado was

7     actually intoxicated on the day of the killing and refused to give the instruction.  RT 1200-01.  Mr.

8     Maldonado contends that his right to due process was violated by the trial court's refusal to

9     instruct the jury on voluntary intoxication.

10           This claim was not presented on direct appeal and instead was presented in Mr.

11    Maldonado's *pro se* petition for writ of habeas corpus to the California Supreme Court, which

12    denied it without discussion.  Because the California Supreme Court summarily rejected the claim,

13    and there is no reasoned decision from a lower state court, the federal habeas court "must

14    determine what arguments or theories supported or . . . could have supported, the state court's

15    decision; and then it must ask whether it is possible fairminded jurists could disagree that those

16    arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme]

17    Court."  *Harrington,* 562 U.S. at 102.

18           To obtain federal habeas relief for an error in the jury instructions, a petitioner must show

19    that the error "so infected the entire trial that the resulting conviction violates due process."

20    *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).  Due process does not require that an instruction be

21    given unless the evidence supports it.  *See Hopper v. Evans*, 456 U.S. 605, 611 (1982) (lesser-

22    included offense instruction required in capital case only when the evidence warrants such an

23    instruction).  If a constitutional error is found in the jury instructions, the federal habeas court also

24    must determine whether that error was harmless by looking at the actual impact of the error.

25    *Calderon v. Coleman*, 525 U.S. 141, 146-47 (1998).

26           In California, "[e]vidence of voluntary intoxication is admissible solely on the issue of

27    whether or not the defendant actually formed a required specific intent, or, when charged with

28    murder, whether the defendant premeditated, deliberated, or harbored express malice

United States District Court
For the Northern District of California

1    aforethought."  Former Cal. Penal Code § 22(c) (amended and renumbered as § 29.4 effective

2    January 1, 2013).  A defendant is entitled to an instruction on voluntary intoxication "only when

3    there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected

4    the defendant's 'actual formation of specific intent.'"  *People v. Williams*, 16 Cal. 4th 635, 677

5    (Cal. 1997).  In *Williams*, the court determined there was not substantial evidence of intoxication

6    warranting the instruction where the evidence was that one witness testified the defendant was

7    "'probably spaced out' on the morning of the killings," and that defendant had made comments "in

8    the recorded interview with police that around the time of the killings he was 'doped up' and

9    'smokin' pretty tough then.'"  *Id.*  The *Williams* court found "no error. Assuming this scant

10   evidence of defendant's voluntary intoxication would qualify as 'substantial,' there was no

11   evidence at all that voluntary intoxication had any effect on defendant's ability to formulate

12   intent."  *Id.* at 678.

13            Here, the California Supreme Court reasonably could have determined that Mr.

14   Maldonado's right to due process was not violated by the refusal to give a voluntary intoxication

15   instruction because he had not shown his entitlement to such an instruction under state law.  Under

16   state law, Mr. Maldonado had to show two things to be entitled to the instruction.  First, he had to

17   show substantial evidence of voluntary intoxication.  The evidence of actual voluntary intoxication

18   was slim and speculative.  As the trial court observed at the jury instruction conference, the one

19   witness who testified about Mr. Maldonado's intoxication was merely relaying hearsay from Mr.

20   Maldonado that he was injected by the victim and passed out, but that was not enough to show

21   actual intoxication at the time of the killing:  "[w]ithout any evidence to indicate, in fact, what he

22   was injected with, whether or not he was intoxicated, whether or not he suffered some effects of

23   intoxication, there is nothing in the record."  RT 1202.[2]  Second, Mr. Maldonado had to show that

24   _____

25   [2] The witness to whom the trial court referred was Aura Graham, Mr. Maldonado's aunt.  Ms.
     Graham had testified to several telephone conversations she had with Mr. Maldonado while he
26   was in jail.  Ms. Graham testified that Mr. Maldonado told her in one jail phone conversation that
     Ms. Moore had shot him up and that he did not remember anything until waking with Ms. Moore
27   in his arms, see RT 1076-77 and 1091, but Mr. Maldonado also told her a different story, i.e., that
     the death was an accident and that Ms. Moore had fallen into the mirrored closet door, RT 1091.
28   And Ms. Graham admitted that she had suggested a story to Mr. Maldonado, i.e., she told Mr.
     Maldonado to tell the prosecutor that Ms. Moore had caused him to resume taking drugs and "that

13

1    the "intoxication affected the defendant's 'actual formation of specific intent.'" *Williams*, 16 Cal.

2    4th at 678.  Mr. Maldonado does not dispute respondent's assertion that there was absolutely no

3    evidence presented on this second point.  Mr. Maldonado did not testify at trial, and the only other

4    person present at the time of the killing was the victim.  No physical or medical evidence was

5    presented showing that Mr. Maldonado had methamphetamine in his system at the time of the

6    stabbing.  The trial court's refusal to give a jury instruction on voluntary intoxication did not

7    violate Mr. Maldonado's right to due process because he was not legally entitled to such an

8    instruction under state law.

9           Mr. Maldonado argues that the testimony of police officer Rodgers provided evidence that

10   Mr. Maldonado was voluntarily intoxicated.  But officer Rodgers did not testify that Mr.

11   Maldonado was intoxicated; instead, officer Rodgers merely testified to facts that Mr. Maldonado

12   contends are consistent with intoxication.  Officer Rodgers testified that Mr. Maldonado was

13   "excited, hysterical, concerned, distraught," RT 742, when he (Rodgers) arrived at the scene.

14   Although Mr. Maldonado argues this showed intoxication, the agitation that Mr. Maldonado

15   exhibited was also consistent with the stress of his girlfriend dying or with him having just

16   murdered his girlfriend.  Insofar as it showed actual intoxication, this evidence was quite weak.

17   Officer Rodgers also testified that, upon searching Mr. Maldonado, he had found four "lupium"

18   pills, which the officer described as a prescription narcotic.  RT 747.  Mr. Maldonado's possession

19   of unconsumed lupium pills did nothing to show that he was intoxicated on methamphetamine or

20   another substance at the time of the killing.  Mr. Maldonado also points to evidence about

21   methamphetamine found in Ms. Moore's body, but *her* use of drugs did not establish *his* use of

22   drugs.  Viewed individually or cumulatively, these bits of evidence do not amount to "substantial

23   evidence" of Mr. Maldonado's "voluntary intoxication," and there was absolutely no evidence that

24   the purported "intoxication affected [his] 'actual formation of specific intent,'" so as to satisfy the

25   criteria for giving an instruction on voluntary intoxication.  *Williams*, 16 Cal. 4th at 677.  Since he

26   did not satisfy the criteria for a voluntary intoxication defense, the evidence did not warrant the

27

28

shit messed your head up."  RT 1069, 1074.

United States District Court
For the Northern District of California

1    instruction.  *Cf. Hopper*, 456 U.S. at 611 (lesser-included offense instruction should be given if the

2    evidence would permit a jury rationally to find the defendant guilty of the lesser offense).

3          Mr. Maldonado also reports that he does not remember exactly what happened, but he "had

4    like[] a dream that he was running from Katrina [Moore]," who was chasing him with a knife,  and

5    he "had like[] a dream that he had a struggl[e] with Katrina [Moore] and [he] guess[es] during the

6    struggling Katrina was stabbed."  Docket No. 6 at 17.  He then argues "[t]hat is what petitioner

7    thinks that really happened.  Petitioner was too drugged on methamphetamine to remember what

8    really occurred near the stabbing of Katrina."  *Id.*  His current version of what occurred provides

9    no support for the jury instruction on voluntary intoxication because he did not testify at trial, and

10   there was no other evidence presented of this dream-like recollection.  Evidence not presented at

11   trial does not support the defendants' right to a jury instruction.  Mr. Maldonado is not entitled to

12   relief on his instructional error claim.

13   C.    Prosecutor's Misstatement of the Law In Rebuttal Closing Argument

14         Mr. Maldonado claims that the prosecutor engaged in misconduct by misstating the law on

15   heat-of-passion voluntary manslaughter.  In California, heat-of-passion voluntary manslaughter

16   requires that the provocation be such as would cause an ordinary person "to act rashly and without

17   due deliberation," and not that the provocation be such as would cause an ordinary person to kill.

18   The prosecutor focused on Mr. Maldonado's particular conduct and expressed the standard the

19   first (correct) way a few times, and the second (incorrect) way several times during her rebuttal

20   closing argument.  The latter amounted to prosecutorial misconduct in Mr. Maldonado's view.

21   Mr. Maldonado further urges that his trial counsel provided ineffective assistance in not objecting

22   to the misstatements of the law.

23         1.    Background

24         Four of the five misstatements occurred in quick succession during the prosecutor's

25   rebuttal argument.  The prosecutor gave as an example of heat of passion the situation where a

26   person walks into his bedroom to find his significant other in bed with another person and

27   immediately grabs a gun on the side of the bed and shoots them.  RT 1395-96.

28

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

[T]hat's an example of the victim, your significant other, provoking you, an ordinary reasonable person, to act rashly rather than from judgment.  Remember, it's not did the defendant act rashly and under the sudden quarrel and heat of passion.  The standard is would an ordinary, reasonable person in the defendant's situation *have done what he did*. . . .

Now you know the law of manslaughter.  Let's take what we know and apply it to the facts.  First of all, this is not heat of passion and manslaughter because the defendant's behavior was not the conduct of a reasonable person of average disposition.  The defendant's behavior was the behavior of a desperate and scorned man.  So are we to say that because Katrina [Moore] was trying to break up with him, because they were in an argument, therefore, what he did should be reduced, the fact that he stabbed her should be reduced from murder to manslaughter?  *His actions are not what a reasonable, ordinary person would do.*

[Ms. Moore's ex-husband] Todd, maybe he beat Katrina [Moore] up, but when they split up and when they were fighting, he beat her up and they split up and she was still living.  So now she's trying do [sic] the same thing with the defendant.  *They're arguing and he stabs her.  And is that enough?  Is that what a reasonable person would do*?  Don't let him, because of what he did, reduce murder to manslaughter.  *His behavior is not the conduct of an average reasonable person.*

RT 1396-97 (emphasis added).  The fifth misstatement of the law occurred later in the rebuttal argument when the prosecutor discussed that Ms. Moore was trying to end her relationship with Mr. Maldonado in the days leading up to her death.  The prosecutor urged:  "And *would an average person react the way that he did* because someone's trying to break up with them?  No. It's not in the heat of passion."  RT 1401 (emphasis added).

The prosecutor did, however, state the law of heat of passion correctly at several other places in her rebuttal argument.  The prosecutor reviewed the jury instruction on manslaughter in her rebuttal argument.  RT 1393-94.  She read the part of the instruction that covered the heat of passion requirements:  "One, the defendant was provoked; two, as a result of the provocation the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; three, *the provocation would have caused a person of average disposition to act rashly and without due deliberation, that is from passion rather than judgment*."  RT 1394 (emphasis added).  The prosecutor also read the part of the instruction that stated:  "In deciding whether the provocation was sufficient, consider whether a person of average disposition in the same situation and knowing the same facts *would have reacted from passion rather than judgment*."  RT 1394

(emphasis added).  After reading the instruction, the prosecutor stated:  "So what you're asking yourself in a manslaughter, is [sic] the victim's actions equal provocation *that would cause an ordinary person to act rashly in response*?  It's the victim's actions."  RT 1394-95 (emphasis added).

The California Court of Appeal rejected Mr. Maldonado's claim of prosecutorial misconduct.  The state appellate court noted that the People conceded that the prosecutor committed misconduct by focusing on whether a "reasonable person of average disposition would have killed under the circumstances."  Cal. Ct. App. Opinion at 16 (internal quotation marks omitted).  "'[P]rovocation is not evaluated by whether the average person would *act* in a certain way: to kill.  Instead, the question is whether the average person would *react* in a certain way: with his reason and judgment obscured.'"  Cal. Ct. App. Opinion at 15 (quoting *People v. Beltran,* 56 Cal. 4th 935, 949 (Cal. 2013)).  Although error had been conceded, the prosecutorial misconduct claim was forfeited on appeal "because trial counsel did not request an admonishment or object to any of the challenged remarks," as was required under California law to preserve the issue for appeal.  Cal. Ct. App. Opinion at 16.  The California Court of Appeal then determined that Mr. Maldonado's alternative claim of ineffective assistance of counsel did not save him.

> Even if trial counsel had no valid tactical reason for failing to object to the prosecutor's misstatement of the law, appellant cannot demonstrate a reasonable probability the outcome of his trial would have been different absent that error. "The standard for prejudice is a reasonable probability that, but for counsel's error, the verdict would have been different. [Citations.]" (*People v. Neely* (2009) 176 Cal.App.4th 787, 796; *Strickland, supra,* 466 U.S. at pp. 691–694.) Here, the court's instructions to the jury rendered harmless any prosecutorial misconduct. The court instructed the jury with revised CALCRIM No. 570, which provided, in clear and unambiguous terms, the objective requirement that the provocation must be sufficient to arouse the passions of a reasonable person, and contained no reference to how a reasonable person would react under the same circumstances. (*Beltran, supra,* 56 Cal.4th at p. 954.) In addition, the court instructed the jury that "[n]othing that the attorneys say is evidence" and that "[y]ou must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."
>
> "[W]e presume that the jury relied on the instructions, not the arguments, in convicting [appellant]." (*People v. Morales* (2001) 25 Cal.4th 34, 47; *see also People v. Boyette* (2002) 29 Cal.4th 381,

United States District Court
For the Northern District of California

436 [presuming the jury followed the court's instructions on the law, including the instruction that "to the extent the law as given by the trial court conflicted with the description of the law as given by the attorneys, the jury was to follow the court's instructions"].) We are not persuaded by appellant's claim that the timing of the prosecutor's statements unduly swayed or confused the jury.  (*Cf. Najera, supra*, 138 Cal.App.4th at p. 224 [prosecutor's misstatements not prejudicial despite jury confusion regarding reasonableness of the defendant's conduct where the "court correctly instructed the jury to follow [its] instructions, not the attorneys' description of the law"]; *Beltran, supra* 56 Cal.4th at p. 956 [prosecutor's misstatements of law did not prejudice the defendant where the court's clarifying instruction "properly refocused the jury on the relevant mental state, properly set out in CALCRIM No. 570, and away from whether an ordinary person of average disposition would kill in light of the provocation"].)

Moreover—and as discussed above—the first degree murder verdict was well supported by evidence and the evidence supporting a voluntary manslaughter verdict was weak. (*Najera, supra*, 138 Cal.App.4th at p. 224 [failure to object was harmless error where facts did not support a manslaughter defense].)

Cal. Ct. App. Opinion at 16-17 (alterations in source).

   2.   <u>Analysis</u>

   A defendant's due process rights are violated when a prosecutor's comments render a trial fundamentally unfair.  *See Darden v. Wainwright*, 477 U.S. 168, 170, 181, 183 (1986); *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.")  Even if prosecutorial misconduct occurred, habeas relief is not available unless the constitutional error had a "'substantial and injurious effect or influence in determining the jury's verdict.'"  *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).

   Mr. Maldonado's federal constitutional claim of prosecutorial misconduct is procedurally barred.  A federal court will not review a question of federal law decided by a state court if the decision rests on a state law ground that is independent of the federal question and adequate to support the judgment.  *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  The procedural default doctrine forecloses federal review of a state prisoner's federal habeas claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule.  *See id*. at 729-30.  The Ninth Circuit has recognized and applied the California contemporaneous objection rule in affirming denial of a federal petition for procedural default where there was a complete

1    failure to object at trial.  *See Vansickel v. White*, 166 F.3d 953, 957-58 (9th Cir. 1999); *see e.g.,*

2    *Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005) (federal habeas challenge to the

3    admission of a confession was barred because state appellate court ruled the claim was

4    procedurally defaulted due to failure to challenge the admission of the confession at trial); *Paulino*

5    *v. Castro*, 371 F.3d 1083, 1092-93 (9th Cir. 2004) (barring review of jury-instruction-error claim

6    because no contemporaneous objection); *Vansickel*, 166 F.3d at 957-58 (barring review of

7    challenge to denial of peremptory challenges because no contemporaneous objection).  Mr.

8    Maldonado's failure to object during trial to the prosecutor's misstatements of the law resulted in a

9    procedural default that, unless excused, precludes federal habeas consideration of his prosecutorial

10    misconduct claim.

11        A procedural default will be excused where a petitioner shows cause for the default and

12    resulting prejudice.  Trial counsel's ineffectiveness may excuse a procedural default, but attorney

13    error short of constitutionally ineffective assistance of counsel does not constitute cause and will

14    not excuse a procedural default.  *See McCleskey v. Zant*, 499 U.S. 467, 494, 502 (1991).  Thus, to

15    establish cause on the ground of ineffective assistance of counsel, a petitioner must show that (1)

16    counsel made errors so serious that counsel was not functioning as the counsel guaranteed the

17    defendant by the Sixth Amendment, and (2) the deficient performance prejudiced the defense.

18    *Loveland v. Hatcher*, 231 F.3d 640, 644 (9th Cir. 2000) (quoting *Strickland v. Washington*, 466

19    U.S. 668, 687 (1984)).

20        Mr. Maldonado argues here (as he did in the California Court of Appeal) that his trial

21    attorney was ineffective for failing to make an objection during the prosecutor's rebuttal argument.

22    Mr. Maldonado does not show ineffective assistance of counsel because he fails to show prejudice

23    under *Strickland.*  The jury instructions correctly stated the law of heat of passion; and the

24    instructions informed the jury to follow the law as the trial court explained it, even if the

25    attorneys' comments conflicted with the court's instructions.  *See* CT 436 (CALCRIM 200) ("You

26    must follow the law as I explain it to you, even if you disagree with it.  If you believe that the

27    attorneys' comments on the law conflict with my instructions, you must follow my instructions.")

28    Mr. Maldonado has provided no reason to depart from the normal presumption that jurors follow

United States District Court
For the Northern District of California

1    the court's instructions.  *See Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985).  Further, as the

2    state appellate court explained, the evidence of voluntary manslaughter was weak and the evidence

3    of first degree murder was well-supported by the evidence.  Due to the combined effect of the

4    strength of the evidence against Mr. Maldonado, the correct jury instructions on the law of heat of

5    passion, and the trial court's reminder to jurors that the court's statement of the law controlled

6    notwithstanding any conflict with counsel's argument, Mr. Maldonado has not shown any

7    prejudice from his counsel's failure to object to the prosecutor's misstatements of the law of heat

8    of passion.  Mr. Maldonado thus has not shown ineffective assistance of counsel that would

9    provide cause to overcome the procedural default of his prosecutorial misconduct claim.

10            Lastly, even if the procedural default had been overcome, the prosecutorial misconduct

11   claim would fail on the merits for essentially the same reasons that there was not ineffective

12   assistance of counsel to excuse the default.  That is, in light of the legally correct jury instruction

13   on heat of passion, the court's reminder to jurors that the court's version of the law controlled, the

14   strength of the evidence of first degree murder, and the paucity of evidence to show that Mr.

15   Maldonado stabbed Ms. Moore in the heat of passion, the alleged prosecutorial misconduct did not

16   have a "'substantial and injurious effect or influence in determining the jury's verdict.'"  *Brecht*,

17   507 U.S. at 638 (1993).  Mr. Maldonado is not entitled to the writ on this claim.

18   D.       Due Process Claim - Evidence of Prior Episodes of Domestic Violence

19            Mr. Maldonado contends that the admission of evidence, under California Evidence Code

20   section 1109, of his prior episodes of domestic violence against Ms. Moore violated his right to

21   due process because the evidence tended to show that he had a propensity to commit crimes.  *See*

22   Docket No. 6 at 52-53; Docket No. 14 at 32-33.  The California Court of Appeal rejected the claim

23   without discussion, except to note that numerous California courts had rejected due process

24   challenges to evidence admitted under California Evidence Code section 1109.  Cal. Ct. App.

25   Opinion at 19 n.5.

26            Due to the summary rejection of the claim by the state court, the federal habeas court

27   "must determine what arguments or theories supported or . . . could have supported, the state

28   court's decision; and then it must ask whether it is possible fairminded jurists could disagree that

20

1  those arguments or theories are inconsistent with the holding in a prior decision of [the U.S.

2  Supreme] Court." *Harrington,* 562 U.S. at 102.  Here, the absence of clearly established Supreme

3  Court precedent is fatal to the claim.

4       In order to violate due process, the allegedly wrongful admission of evidence must be "so

5  extremely unfair that its admission violates 'fundamental conceptions of justice.'" *Dowling v.*

6  *United States*, 493 U.S. 342, 352 (1990) (quoting *United States v. Lovasco*, 431 U.S. 783, 790

7  (1977) (due process was not violated by admission of evidence to identify perpetrator and link him

8  to another perpetrator even though the evidence also was related to crime of which defendant had

9  been acquitted); *see, e.g., Gimenez v. Ochoa*, 821 F.3d 1136, 1145 (9th Cir. 2016) (petitioner who

10  showed that a vigorous debate had sprung up as to the validity of the "triad-only" theory of shaken

11  baby syndrome in the years since his murder conviction, "failed to show that permitting the

12  prosecution's experts to testify based on a triad-only theory of [shaken baby syndrome] was 'so

13  extremely unfair that it[] . . . violated fundamental conceptions of justice.'").  Mr. Maldonado

14  does not identify any vice in the evidence other than that it tended to show his propensity to

15  commit crimes, and does not meet the demanding standard of showing the evidence to be so

16  extremely unfair-that its admission violates fundamental conceptions of justice.

17       Most importantly, the United States Supreme Court has never held that the introduction of

18  propensity or other allegedly prejudicial evidence violates due process.  *See Estelle v. McGuire*,

19  502 U.S. 62, 68-70 (1991).  In fact, *Estelle v. McGuire* specifically left open the question

20  regarding propensity evidence.  *See id.* at 75 n.5 ("we express no opinion on whether a state law

21  would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show

22  propensity to commit a charged crime").

23       In *Estelle v. McGuire*, the defendant was on trial for murder of his infant daughter after she

24  was brought to a hospital and died from numerous injuries suggestive of recent child abuse.  The

25  defendant told police the injuries were accidental.  Evidence was admitted at trial that the coroner

26  discovered during the autopsy older partially healed injuries that had occurred 6-7 weeks before

27  the child's death.  *Id.* at 65.  Evidence of the older injuries was introduced to prove "battered child

28  syndrome," which "exists when a child has sustained repeated and/or serious injuries by

United States District Court
For the Northern District of California

1  nonaccidental means." *Id.* at 66.  The state appellate court had held that the proof of prior injuries

2  tending to establish battered child syndrome was proper under California law.  *Id.*  In federal

3  habeas proceedings, the Ninth Circuit found a due process violation based in part on its

4  determination that the evidence was improperly admitted under state law. *Id.* at 66-67.  The U.S.

5  Supreme Court first held that the Ninth Circuit had erred in inquiring whether the evidence was

6  properly admitted under state law because "'federal habeas corpus relief does not lie for errors of

7  state law.'" *Id.* at 67.  The Supreme Court then explained:

8   > The evidence of battered child syndrome was relevant to show
9   > intent, and nothing in the Due Process Clause of the Fourteenth
     > Amendment requires the State to refrain from introducing relevant
     > evidence simply because the defense chooses not to contest the
10   > point. [¶] Concluding, as we do, that the prior injury evidence was
     > relevant to an issue in the case, we need not explore further the
11   > apparent assumption of the Court of Appeals that it is a violation of
     > the due process guaranteed by the Fourteenth Amendment for
12   > evidence that is not relevant to be received in a criminal trial. We
     > hold that McGuire's due process rights were not violated by the
13   > admission of the evidence. *See Spencer v. Texas*, 385 U.S. 554, 563–
     > 564, 87 S.Ct. 648, 653–654, 17 L.Ed.2d 606 (1967) ("Cases in this
14   > Court have long proceeded on the premise that the Due Process
     > Clause guarantees the fundamental elements of fairness in a criminal
15   > trial. . . .  But it has never been thought that such cases establish this
     > Court as a rulemaking organ for the promulgation of state rules of
16   > criminal procedure").

17  *Estelle v. McGuire*, 502 U.S. at 70 (omission in original).

18      The cited case, *Spencer v. Texas*, 385 U.S. at 563, held that the admission of evidence of

19  prior convictions did not violate due process.  The Supreme Court explained in *Spencer* that,

20  although there may have been other, perhaps better, ways to adjudicate the existence of prior

21  convictions (e.g., a separate trial on the priors after the trial on the current substantive offense

22  resulted in a guilty verdict), Texas' use of prior crimes evidence in a "one-stage recidivist trial"

23  did not violate due process.  *Id.* at 563-64.  "In the face of the legitimate state purpose and the

24  long-standing and widespread use that attend the procedure under attack here, we find it

25  impossible to say that because of the possibility of some collateral prejudice the Texas procedure

26  is rendered unconstitutional under the Due Process Clause as it has been interpreted and applied in

27  our past cases." *Id.* at 564.

28      *Estelle v. McGuire* also cited to *Lisenba v. California*, 314 U.S. 219, 228 (1941), in

support of the conclusion that the introduction of the battered child syndrome evidence did not so infuse the trial with unfairness as to deny due process of law.  *See Estelle v. McGuire*, 502 U.S. at 75.  In *Lisenba*, the Supreme Court rejected a claim that the admission of inflammatory evidence violated the defendant's due process rights.  The evidence at issue in *Lisenba* was live rattlesnakes and testimony about them to show they had been used by the defendant to murder his wife.  "We do not sit to review state court action on questions of the propriety of the trial judge's action in the admission of evidence. We cannot hold, as petitioner urges, that the introduction and identification of the snakes so infused the trial with unfairness as to deny due process of law. The fact that evidence admitted as relevant by a court is shocking to the sensibilities of those in the courtroom cannot, for that reason alone, render its reception a violation of due process."  *Lisenba*, 314 U.S. at 228-29.

These three Supreme Court cases declined to hold that the admission of prejudicial or propensity evidence violates the defendant's due process rights.  No Supreme Court cases since *Estelle v. McGuire* have undermined the holdings in these three cases.  In other words, there is no Supreme Court holding that the admission of prejudicial or propensity evidence violates due process.  When the U.S. Supreme Court "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, 'it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law.' . . .  Under the explicit terms of § 2254(d)(1), therefore, relief is unauthorized."  *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (alterations in original) (quoting *Carey v. Musladin*, 549 U.S. 70, 77 (2006), and 28 U.S.C. § 2254(d)(1)).

Circuit courts have recognized that the United States Supreme Court has never held that the introduction of propensity or other allegedly prejudicial evidence violates due process.  *See Foy v. Gipson*, 609 F. App'x 903 (9th Cir. 2015) (no habeas relief on claim that admission of propensity evidence (i.e., that defendant assaulted another woman after he assaulted victim in this case) violated defendant's right to due process because *Estelle v. McGuire's* reservation of the question whether propensity evidence violates due process "forecloses the conclusion that the state court's decision was contrary to, or an unreasonable application of, clearly established federal law); *Munoz v. Gonzales*, 596 F. App'x 588 (9th Cir. 2015) (even if admission of evidence of prior

United States District Court
For the Northern District of California

auto theft was improperly admitted to show propensity, habeas relief foreclosed because *Estelle v. McGuire* reserved the question whether propensity evidence violated due process); *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (denying habeas relief upon finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established Federal law under § 2254(d)); *Alberni v. McDaniel*, 458 F.3d 860, 865 (9th Cir. 2006) (denying habeas relief on claim that due process was violated by admission of evidence of defendant's past violent actions and explosive temper to show propensity due to *Estelle v. McGuire's* reservation of the question whether propensity evidence violates due process); *Moses v. Payne*, 555 F.3d 742, 760 (9th Cir. 2009) (because balancing test for excluding evidence was creation of Ninth Circuit law and Supreme Court had not directly considered whether trial court's exercise of discretion to exclude evidence violated defendants' constitutional right to present evidence, state court's failure to use Ninth Circuit's balancing test is not contrary to or an unreasonable application of clearly established Supreme Court precedent).

"[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."  *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).  Bearing in mind the extremely general nature of the Supreme Court's articulation of a principle of "fundamental fairness" – i.e., evidence that "is so extremely unfair that its admission violates 'fundamental conceptions of justice'" may violate due process, *Dowling*, 493 U.S. at 352, – the California Court of Appeal's rejection of Mr. Maldonado's due process claim was not contrary to or an unreasonable application of clearly established federal law as set forth by the Supreme Court.  *See generally Holley*, 568 F.3d at 1101 (denying writ because, although Supreme Court "has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." (internal citation omitted)).

Moreover, in this circuit, the admission of prejudicial evidence may make a trial

United States District Court
For the Northern District of California

1   fundamentally unfair and violate due process "[o]nly if there are *no* permissible inferences the jury

2   may draw from the evidence." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991).

3   "Evidence introduced by the prosecution will often raise more than one inference, some

4   permissible, some not; we must rely on the jury to sort them out in light of the court's instructions.

5   Only if there are *no* permissible inferences the jury may draw from the evidence can its admission

6   violate due process.  Even then, the evidence must 'be of such quality as necessarily prevents a

7   fair trial.'  Only under such circumstances can it be inferred that the jury must have used the

8   evidence for an improper purpose." *Jammal*, 926 F.2d at 920 (internal citation and footnote

9   omitted).[3]

10       Here, the jury could draw the inference of a propensity to commit a murder from the

11   evidence of the prior domestic violence.  The jurors were instructed that, if they decided that Mr.

12   Maldonado committed the uncharged domestic violence, they "may, but are not required to,

13   conclude from that evidence that [Mr. Maldonado] was disposed or inclined to commit domestic

14   violence and, based on that decision, also conclude that the defendant was likely to commit

15   murder, as charged here."  CT 471 (CALCRIM 852).  The instruction merely permitted, but did

16

17   _____

    [3] In *Jammal*, the police found a gun, $47,000 and drugs in the trunk of Jammal's stolen car when
18   they arrested Willis, who had stolen Jammal's car; 18 months later, the police found $135,000 (but
     no drugs) in the trunk of Jammal's car when they arrested Jammal.  At trial, Willis said he had no
19   idea the drugs and money were in the trunk of Jammal's stolen car until police opened it.  The
     prosecution urged the jury to infer that both the drugs and the $47,000 found in the trunk of
20   Jammal's car when Willis was arrested belonged to Jammal since Jammal later was arrested also
     with a large stash of cash in his trunk.  Jammal unsuccessfully objected that this evidence
21   effectively branded him a drug dealer and was therefore inadmissible character evidence. The
     Ninth Circuit explained that state law evidence rules were beside the point in a federal habeas
22   proceeding and any problem in the jury inferring that Jammal had put the $47,000 and drugs in the
     car earlier (even if impermissible under state law) was not a constitutional problem because the
23   inference that Jammal had put both the $47,000 and drugs in the trunk on an earlier occasion was a
     "rational inference" the jury could draw from the evidence that he was caught with $135,000 in his
24   trunk.  *Jammal*, 926 F.2d at 920.

25       *Jammal* is one of the few cases that provides any guidance as to what might amount to the
     introduction of evidence that might amount to fundamental unfairness.  The Ninth Circuit
26   continues to use the *Jammal* "permissible inference" test in habeas cases governed by the AEDPA.
     *See, e.g., Noel v. Lewis*, 605 F. App'x 606, 608 (9th Cir. 2015) (admission of gang evidence did
27   not violate due process); *Lundin v. Kernan*, 583 F. App'x 686, 687 (9th Cir. 2014) (citing *Jammal*
     and concluding that admission of graffiti evidence did not violate due process because there were
28   permissible inferences to be drawn); *Gonzalez v. Knowles*, 515 F.3d 1006, 1011 (9th Cir. 2008)
     (citing *Jammal* and concluding that evidence of prior bad acts did not violate due process).

United States District Court
For the Northern District of California

1    not require, the jury to use the evidence of prior domestic violence upon finding that the domestic

2    violence had occurred. *Id.* Because the inference was permissible, the state appellate court did

3    not unreasonably apply Supreme Court precedent in holding that the admission of the evidence of

4    prior episodes of Mr. Maldonado's domestic violence toward Ms. Moore did not violate due

5    process. *See Jammal*, 926 F.2d at 920.

6          Finally, Mr. Maldonado argues that the prosecutor engaged in misconduct in arguing to the

7    jury that the jury could use Mr. Maldonado's prior acts of domestic violence to show his intent in

8    this case. *See* Docket No. 6 at 8-9. But as explained in the preceding paragraphs, California

9    Evidence Code section 1109 allows the use of prior acts of domestic violence to prove propensity

10    and the U.S. Supreme Court has never held that the use of propensity evidence violates due

11    process. *See also United States v. LeMay*, 260 F.3d 1018, 1031 (9th Cir. 2001) (Federal Rule of

12    Evidence 414, which allows evidence of prior sexual offenses to show a propensity to commit the

13    charged sexual offense in federal criminal cases, does not violate due process). The prosecutor did

14    not commit misconduct violative of due process by arguing the prior acts of domestic violence.

15    E.     Ineffective Assistance of Trial Counsel Claims

16          The Sixth Amendment's right to counsel guarantees not only assistance, but effective

17    assistance, of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for

18    judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper

19    functioning of the adversarial process that the trial cannot be relied upon as having produced a just

20    result. *Id.* In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a petitioner

21    must establish two things. First, he must demonstrate that counsel's performance was deficient

22    and fell below an "objective standard of reasonableness" under prevailing professional norms. *Id*

23    at 687-88. Second, he must establish that she was prejudiced by counsel's deficient performance,

24    i.e., that "there is at a reasonable probability that, but for counsel's unprofessional errors, the result

25    of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability

26    sufficient to undermine confidence in the outcome. *Id.*

27          A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of

28    counsel claims under § 2254. *See Cullen v. Pinholster*, 563 U.S. 170, 202 (2011). The "question

1    is not whether counsel's actions were reasonable.  The question is whether there is any reasonable

2    argument that counsel satisfied *Strickland's* deferential standard."  *Harrington v. Richter*, 562 U.S.

3    at 105.

4            1.    Failing To Identify Provocation by the Victim And Argue Provocation Over Time

5            Mr. Maldonado contends that trial counsel provided ineffective assistance by failing to

6    argue "a viable theory of heat of passion voluntary manslaughter, when such a theory existed

7    based on the evidence."  Docket No. 6 at 22.  His "viable theory" was that he had been provoked

8    "based on multiple events, with the major events occurring over two or three days prior to the

9    homicide, influenced by Katrina [Moore]'s previous pattern of mercurial behavior."  *Id.* at 28-29.

10    Those major events were Ms. Moore's abortion and efforts to break off their relationship followed

11    by reconciliation.

12            The California Court of Appeal rejected Mr. Maldonado's claim on both prongs of the test

13    under *Strickland v. Washington*, 466 U.S. 668 (1984).[4]  The appellate court determined that "trial

14    counsel did identify situations where Moore provoked" Mr. Maldonado.  Cal. Ct. App. Opinion at

15    8.  For example, Mr. Wilson testified overhearing Mr. Maldonado complaining on the day of the

16    killing that Ms. Moore kept "bring[ing] up something old[,]" and there had been testimony that

17    Ms. Moore was controlling, had a history of fighting with her partners, and had slapped Mr.

18    Maldonado in anger.  *Id.* (alterations in source).  Defense counsel argued that Ms. Moore's very

19    high methamphetamine and amphetamine levels on the day of her death "could explain why she

---

[4] In addition to rejecting the claims on the merits, the California Court of Appeal rejected the ineffective assistance of counsel claims asserted on appeal (i.e., the claims discussed in Sections E.1, E.2 and E.4 in the text) for a procedural reason related to the fact that the claims had been presented on direct appeal rather than in a habeas petition.  The record on appeal did not provide trial counsel's reasons for failing to identify provocation by the victim and argue provocation over time (discussed in § E.1); failing to request jury instructions elaborating on provocation (discussed in § E.2); and failing to request a modification of CALCRIM No. 852 on prior acts of domestic violence (discussed in § E.4).  An ineffective-assistance claim will be rejected on direct appeal "'unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation.'"  Cal. Ct. App. Opinion at 8.  The California Court of Appeal's application on the state rule regarding ineffective-assistance of counsel claims brought on direct appeal does not impose a procedural bar to federal habeas review of the claims because that court reached the merits of the claims and did not treat them as procedurally defaulted.  *See generally Panther v. Hames*, 991 F.2d 576, 580 (9th Cir. 1993) (where the state appellate court overlooks the procedural problem and decided the claim on the merits, federal court also can reach the merits of the claim).

was 'agitated and having issues with'" Mr. Maldonado. *Id.* "[C]ounsel's decision to focus on the day of Moore's death--rather than the weeks and months leading up to that date--was a reasonable tactical choice" to avoid the jury focusing on Mr. Maldonado's "increasingly possessive and violent behavior." *Id.* at 8-9. The court noted that counsel reasonably could have chosen not to focus on provocation based on a series of events over time because that theory was "relatively weak in light of testimony supporting a cooling off period, specifically: (1) Wilson's testimony that appellant and Moore did not argue the evening before her death; (2) appellant and Moore made breakfast together on the morning of June 5, 2010; and (3) Moore seemed 'fine' that morning." *Id.* at 9.

The California Court of Appeal rejected the claim for the additional reason that Mr. Maldonado had not shown prejudice, as required for relief under *Strickland*. Cal. Ct. App. Opinion at 9-10.

> The defense conceded appellant stabbed and killed Moore; the evidence supporting the first degree murder conviction was strong: (1) appellant had a history of physically abusing Katrina [Moore]; (2) he had to walk at least 20 feet to the kitchen to retrieve the knife and walk another 20 feet back to the bedroom to stab Moore; (3) appellant had a motive to kill Moore because she had an abortion and was going to leave him; and (4) his evasive actions after stabbing Moore appeared calculated and suggested consciousness of guilt consistent with a willful, premeditated murder. (*See People v. Famalaro* (2011) 52 Cal.4th 1, 36 [jury could infer consciousness of guilt from the defendant's attempts to conceal evidence in first degree murder prosecution].) In light of the significant evidence supporting the jury's verdict, and, as explained above, the weakness of a defense based on provocation over a period of time or a defense based on provocation by Moore, appellant has not shown a reasonable probability he would have been convicted of second degree murder or voluntary manslaughter had trial counsel presented a different theory of provocation. (*See People v. Wharton* (1991) 53 Cal.3d 522, 572 [by finding the defendant guilty of first degree murder, the jury rejected a theory he "acted under the heat of passion—even if that state of mind was achieved after a considerable period of provocatory conduct"].)

Cal. Ct. App. Opinion at 9-10.

As the last reasoned decision from a state court, the California Court of Appeal's decision is the decision to which § 2254(d) is applied. *See Ylst*, 501 U.S. at 803-04; *Barker*, 423 F.3d at 1091-92. Mr. Maldonado is entitled to habeas relief only if the California Court of Appeal's

28

United States District Court
For the Northern District of California

1    decision was contrary to, or an unreasonable application of, clearly established federal law from

2    the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the

3    evidence presented.

4           Mr. Maldonado does not meet that demanding standard because the California Court of

5    Appeal's rejection of his claim was a reasonable application of *Strickland*.  The California Court

6    of Appeal reasonably determined that there was no deficient performance because arguing that Mr.

7    Maldonado was provoked by a series of events would have been a risky strategy that counsel

8    reasonably avoided.[5]  Focusing on events in the days preceding the killing posed a high risk that

9    the jury would see Mr. Maldonado's behavior as premeditated and deliberate, and that he finally

10   decided to kill Ms. Moore to prevent her from being with anyone but him.  Trial counsel also may

11   have been concerned about focusing the jury's attention on the weeks and months leading up to

12   her death because that evidence included evidence that Mr. Maldonado had been physically

13   violent toward her on several occasions; Mr. Maldonado had repeatedly called her and left

14   desperate messages; Mr. Maldonado had chased after her on her way to the abortion clinic; and

15   Mr. Maldonado had discarded a knife as he departed from her home just days before her death.

16   Further, the "provocations" that Mr. Maldonado identifies -- the abortion and the victim's pattern

17   of breaking-up and then making-up with him -- had been followed by reconciliation-type conduct

18   by the couple, thereby suggesting that Mr. Maldonado was not actually provoked by those events.

19   And there had been a cooling-off time period after the earlier events.  "'[I]f sufficient time has

20   elapsed between the provocation and the fatal blow for passion to subside and reason to return, the

21   killing is not voluntary manslaughter.'"  *Moye*, 47 Cal. 4th at 550.

22           "[C]ounsel has wide latitude in deciding how best to represent a client, and deference to

23

24   _____

25   [5] In a state habeas petition filed after his direct appeal was filed (but that was not under
     consideration by the California Court of Appeal at the time of the direct appeal), Mr. Maldonado's
     counsel provided a declaration that confirmed he had deliberately chosen not to argue provocation
26   over time in the weeks leading up to Ms. Moore's death because he wanted to focus on the day of
     the death.  *See* Docket No. 13-21 at 62 ("The reason I did not consider requesting such an
27   instruction and making such an argument is because my approach to the case was to narrow the
     scope of the killing to the activities that occurred shortly before the killing, rather than to argue
28   that what prompted the killing was the ups and downs in Mr. Maldonado's and Ms. Moore's
     relationship or the abortion, since Mr. Maldonado knew about the planned abortion.")

1   counsel's tactical decisions in his closing presentation is particularly important because of the

2   broad range of legitimate defense strategy at that stage." *Yarborough v. Gentry*, 540 U.S. 1, 5-6

3   (2003).  It was not unreasonable for the state appellate court to conclude that counsel's decision to

4   forego a theory of provocation based on a series of events was well within that wide latitude of

5   choices as to how to best represent Mr. Maldonado.

6          The state appellate court did incorrectly state that counsel identified certain situations

7   where Ms. Moore provoked Mr. Maldonado.  As Mr. Maldonado points out, evidence was

8   presented, but there was no argument by defense counsel, that Mr. Wilson heard Mr. Maldonado

9   complaining that Ms. Moore kept "'bring[ing] up something old,'" and that Ms. Moore "had a

10  history of fighting with her partners, and had slapped [Mr. Maldonado] when she was angry."

11  Cal. Ct. App. Opinion at 8.  The California Court of Appeal was, however, correct in noting that

12  trial counsel argued that Ms. Moore "had 'a very high level of methamphetamine and

13  amphetamine' in her system when she died, which he argued could explain why she was 'agitated

14  and having issues with' appellant." *id.*; *see* RT 1366-67.  Notwithstanding its misstatement as to

15  what counsel had argued, the state appellate court's reasoning that counsel did not engage in

16  deficient performance was sound because as noted above the provocation evidence was weak and

17  could well have supported the first degree murder.

18         Moreover, Defense counsel did not merely make an unsupported assertion of heat of

19  passion and sit down; instead, his closing argument blended efforts to poke holes in the

20  prosecution's case with efforts to urge for an accidental or heat of passion killing.  Counsel's

21  multifaceted approach appears to be an effort to make the best of the situation where the defendant

22  had killed someone and had little evidence to reduce his culpability to less than murder.  Defense

23  counsel repeatedly emphasized his theme that the prosecution could not say with certainty what

24  had occurred in the last ninety minutes of the victim's life.  *See* RT 1331, 1341, 1350, 1355,

25  1370.[6]

26

27  _____

    [6] Defense counsel's closing argument also attempted to cast reasonable doubt on the prosecution's
    theory of the crime in other ways in addition to asserting that the prosecutor could not say with
28  certainty what had occurred in that time period.  Defense counsel challenged the credibility of
    several prosecution witnesses due to their drug use and relationships with Ms. Moore.  RT 1332,

*United States District Court*
For the Northern District of California

United States District Court
For the Northern District of California

Although he did not specify the provocation by Ms. Moore, defense counsel tried to convince the jury that manslaughter was a preferred verdict over murder because the stabbing occurred during the "heat of an argument."  RT 1346 ("no way willful deliberate murder can be shown in this particular case where it occurs in the situation where they are in the heat of an argument right now"); 1347 ("This obviously happened in the heat of an argument and in the heat of passion"); 1348 ("I think it is a manslaughter, because it happened in the heat of an argument, in the heat of passion."); 1349 ("I think you can kind of assume that there was a lot of intense emotion there that obscured his reasoning or judgment").  And after reading the portion of the instruction that stated that heat of passion "'can be any violent or intense emotion that causes a person to act without due deliberation and reflection,'" counsel said,  "And that's, I think, the key thing," i.e., that the "defendant must have acted under the direct and immediate influence of provocation."  RT 1349.  Counsel continued with the observation that "we know at this time in that room they were fighting or had been fighting at some point.  We don't know exactly when, but we know that was the case."  RT 1350.  Defense counsel also suggested that heat of passion existed.  He did not identify the particular provocation by the victim that prompted the rash act by defendant, but that was consistent with his theme that the specifics of the incident were unknown. Counsel also urged that the drug use of Ms. Moore and Mr. Maldonado was a factor in the killing. RT 1368.  Counsel urged that Ms. Moore had been heavily using drugs that day, which was significant because "when she used drugs she became a little more agitated at times," and "that would be possibly one of the reasons why she would have been agitated and having issues with Mr. Maldonado."  RT 1366, 1367.  Defense counsel also suggested the possibility that Mr. Maldonado was on drugs and "had passed out and woke up with Katrina [Moore] laying in his

---

1334-35.  He argued that the consciousness-of-guilt evidence (e.g., hiding the knife and making false statements) was not helpful to the jury because it did not point to whether the killing was murder or manslaughter.  RT 1348.  Counsel urged that the prior incidents of domestic violence did not show Mr. Maldonado's intent on the date of the killing.  RT 1345, 1350-52, 1364.  And, in an effort to cast doubt on the scorned-lover theory advanced by the prosecutor, defense counsel argued that Ms. Moore was not trying to end her relationship with Mr. Maldonado and instead that their relationship always had been a mercurial one.  RT 1332, 1335-36, 1344, 1353-54.  Counsel also suggested the possibility of an accidental killing, as he urged that the evidence supported a conclusion that Ms. Moore and Mr. Maldonado did not think the wound was serious, which also would explain why medical help was not summoned earlier.  *See* RT 1355, 1371.

United States District Court
For the Northern District of California

arms dying." RT 1367, 1369.  The state appellate court's determination that counsel's approach in the closing argument did not amount to deficient performance was a reasonable application of *Strickland*.

The state appellate court's determination that the prejudice prong of *Strickland* had not been satisfied also was a reasonable determination.  As the California Court of Appeal explained, the evidence of first degree murder was strong and evidence in support of a lesser offense was weak.  The evidence that strongly pointed toward first degree murder included the following: Mr. Maldonado had a motive to murder, i.e., Ms. Moore had had an abortion and was trying to leave him; Mr. Maldonado had a history of physically abusing her; he had the opportunity for reflection as he retrieved a knife from the kitchen to return to the bedroom to stab her; he plunged the knife eight inches into her chest; he fabricated a story that she had been wounded by shards from a mirror when she fell into the mirror; and he hid the murder weapon.  And the evidence in support of a theory that Mr. Moore had been provoked by Ms. Moore over time or on that particular day was weak.  The state appellate court reasonably determined there was no reasonable probability of a different result if counsel had argued provocation based on multiple events occurring over time.

    2.    <u>Failure To Request Jury Instructions Elaborating on Provocation</u>

Mr. Maldonado contends that his trial counsel was ineffective for failing to request a pinpoint instruction that "adequate provocation can result from a series of events over time." Docket No. 6 at 42.

Several instructions that were given touched upon provocation.

> The court instructed the jury that "[p]rovocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide." The court further instructed the jury that murder can be reduced to manslaughter if: "the defendant was provoked ... [and] as a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment;" and the "provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment." The court specified "[s]ufficient provocation may occur over a short or long period of time." Trial counsel did not request a pinpoint instruction stating provocation can arise as a result of a series of events over time.

1   Cal. Ct. App. Opinion at 11-12.

2        The California Court of Appeal rejected the ineffective assistance of counsel claim on both

3   prongs of the *Strickland* test.  Counsel made a reasonable tactical choice to focus on the day of

4   death rather than events leading up to the day of death because of the weakness of evidence

5   supporting a defense of provocation from a series of events over time.  *Id.* at 12. No prejudice

6   occurred from counsel's failure to request the pinpoint evidence because the jury instructions

7   given did mention that "'sufficient provocation may occur over a short or long period of time' and

8   because substantial evidence supported the first degree murder conviction and the evidence

9   supporting voluntary manslaughter was weak." *Id.* at 12.

10       As the last reasoned decision from a state court, the California Court of Appeal's decision

11  is the decision to which § 2254(d) is applied.  *See Ylst*, 501 U.S. at 803-04; *Barker*, 423 F.3d at

12  1091-92.  Mr. Maldonado is entitled to habeas relief only if the California Court of Appeal's

13  decision was contrary to, or an unreasonable application of, clearly established federal law from

14  the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the

15  evidence presented.

16       The state appellate court's rejection of the claim on both prongs of the *Strickland* test was a

17  reasonable application of *Strickland.*  As explained in Section E.1, above, counsel's failure to

18  pursue a theory of provocation based on a series of events was a reasonable tactical choice because

19  the same evidence that might show such provocation had a greater tendency to show first degree

20  murder.  Since the theory of provocation based on a series of events was not being pursued, an

21  instruction highlighting that provocation may occur over a long period of time was not necessary.

22       Moreover, the conclusion that Mr. Maldonado did not establish prejudice was a reasonable

23  conclusion by the California Court of Appeal.  A jury instruction that was given *did* state the basic

24  point that "sufficient provocation may occur over a short or long period of time," CT 468

25  (CALCRIM 570), even if it did not inform the jury that the cumulative effect of distinct events

26  occurring over time could be considered.  Also, for the reasons discussed in the preceding section

27  (§ E.1), Mr. Maldonado has not shown a reasonable probability that the result of the proceeding

28  would have been different had such an instruction been requested.  That is, the evidence of

provocation was weak and the evidence of first degree murder was strong.

        3.      <u>Misstatement of Distinction Between Murder and Voluntary Manslaughter</u>

Trial counsel stated during his closing argument:  "[N]ow . . . the real difference between murder and manslaughter is did he intend to kill her. And that if he in fact had an intent to kill her, then why would he not just have let her die? Why would he call the police if his intent before this happened was to kill her? That doesn't make any sense."  RT 1370.  Mr. Maldonado argues that this was legally wrong because "[t]he real difference between murder and manslaughter is whether the defendant acted in response to provocation which would have caused a reasonable person to act rashly from passion, rather than from judgment."  Docket No. 6 at 36-37.  Mr. Maldonado argues that counsel's misstatement amounted to ineffective assistance of counsel.

The court of appeal rejected the claim for lack of a showing of prejudice under *Strickland*.

> First, the mention of intent as a distinguishing factor between murder and manslaughter was an insignificant portion of a 42–page closing argument correctly describing the difference between murder and manslaughter. Trial counsel's use of the word "intent" was not, as appellant argues, "confusing to the jury" because counsel accurately stated the legal standard in other parts of his closing argument and because the jury instructions clarified the proper legal standard. (*See People v. Harrison* (2005) 35 Cal.4th 208, 252.) "Placed in context," trial counsel's statement was "at most a harmless mistake." (*People v. Najera* (2006) 138 Cal.App.4th 212, 222 (*Najera*) [prosecutor's statement equating malice and intent to kill was "at most a harmless mistake"].) Second, appellant cannot establish a reasonable probability of a better result because, as discussed above, substantial evidence supported the first degree murder conviction and the evidence supporting voluntary manslaughter was weak.

Cal. Ct. App. Opinion at 10-11.

As the last reasoned decision from a state court, the California Court of Appeal's decision is the decision to which § 2254(d) is applied.  *See Ylst*, 501 U.S. at 803-04; *Barker*, 423 F.3d at 1091-92.  Again, Mr. Maldonado is entitled to habeas relief only if the California Court of Appeal's decision was contrary to, or an unreasonable application of, clearly established federal law from the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented.

The state appellate court's rejection of the claim on the prejudice prong of the *Strickland*

**United States District Court**
For the Northern District of California

test was a reasonable application of *Strickland.*  Even if counsel had correctly stated the law, there was no reasonable probability of a different result.  The misstatement was but a small part of a long closing argument, the evidence of first degree murder was strong and the evidence of heat of passion was weak, and counsel stated the standard correctly elsewhere in his argument.  RT 1349 (reading voluntary manslaughter instruction).  Additionally, after counsel made the misstatement, he then drew the jury's attention back to the trial court's instructions on the difference between first degree murder, second degree murder, and manslaughter.  RT 1371.  Counsel argued:

> And I will add to that, when you consider the law as it relates to murder and what degree you ought to be finding, you have been read an instructions [sic] by Judge Clay which says, in effect, you must be convinced beyond a reasonable doubt for this case and for it to be murder in the first degree, that there was pre-deliberation, and sobbing [sic], as well as malice.  If you do not find all those factors, then -- then you cannot find this case to be a murder --murder first degree.  But even in addition to that, you've been read an instruction that says if you have a doubt about whether or not it is a murder or a manslaughter, then you ought to find it to be a manslaughter and not murder.  The way you kind of determine those depends on how you find between the different degrees.  In other words, if you find there are two reasonable interpretations, thoughts as to what your belief is that the crime is in this case, and you have those -- some doubts as to whether it was a murder of the first degree, you -- then you must not be -- you must find if it was a murder in the second degree.  And if both doubts are based on reason, you have a reasonable doubt as to those, then you must, not may, you must find that it [sic] a manslaughter and not a murder.  That is the law.

RT 1371-72.

"[A]rguments of counsel generally carry less weight with a jury than do instructions from the court." *Boyde v. California*, 494 U.S. 370, 384-85 (1990).  Mr. Maldonado does not dispute that the jury instructions on murder and voluntary manslaughter were correct under California law. *See* CT 465-468 (CALCRIM 520, 521, 522, 570).  The court also properly instructed the jury that the arguments of counsel are not evidence.  CT 440 (CALCRIM 220).  In light of the substantial evidence supporting the first degree murder verdict, the generally-proper argument from defense counsel, the legally correct instructions given to the jury, and the weakness of the voluntary manslaughter evidence, the California Court of Appeal's conclusion that any deficient performance did not result in prejudice was not objectively unreasonable.

United States District Court
For the Northern District of California

1      4.      Failure To Request Modification of CALCRIM No. 852

2          At the request of both parties, the jury was given an instruction on prior acts of domestic

3   violence.  The instruction provided, in relevant part:  "The People presented evidence that the

4   defendant committed domestic violence that was not charged in this case. [¶] ... [¶] If you decide

5   that the defendant committed the uncharged domestic violence, you may, but are not required to,

6   conclude from that evidence that the defendant was disposed or inclined to commit domestic

7   violence and, based on that decision, also conclude that the defendant *was likely to commit*

8   *murder, as charged here*."  CT 471 (CALCRIM 852) (emphasis added). Mr. Maldonado contends

9   that counsel was ineffective in not requesting that the instruction be modified to include voluntary

10  manslaughter.  That is, he contends that counsel should have sought to have the instruction

11  modified to provide that his prior acts of domestic violence would allow the jury to conclude that

12  he was likely to commit murder or voluntary manslaughter.

13         The California Court of Appeal rejected the claim for lack of a showing of prejudice under

14  *Strickland*.  "The modification to CALCRIM No. 852 would not have affected the significant

15  amount of evidence supporting the first degree murder conviction.  Additionally and perhaps most

16  importantly, the prior domestic violence evidence did not tend to show appellant acted in the heat

17  of passion. To the contrary and as appellant concedes, the 'significant pattern of domestic violence

18  . . . increased the likelihood,' the jury would find he premeditated and deliberated before killing

19  Moore."  Cal. Ct. App. Opinion at 13-14 (3ellipses in original; footnote omitted).

20         As the last reasoned decision from a state court, the California Court of Appeal's decision

21  is the decision to which § 2254(d) is applied.  *See Ylst*, 501 U.S. at 803-04; *Barker*, 423 F.3d at

22  1091-92.  As noted above, Mr. Maldonado is entitled to habeas relief only if the California Court

23  of Appeal's decision was contrary to, or an unreasonable application of, clearly established federal

24  law from the U.S. Supreme Court, or was based on an unreasonable determination of the facts in

25  light of the evidence presented.

26         The state appellate court's rejection of the claim on the prejudice prong of the *Strickland*

27  test was a reasonable application of *Strickland.*  As the state court explained, Mr. Maldonado's

28  prior violence against Ms. Moore was not particularly probative as to whether he acted in a heat of

passion on the date of the killing.  Moreover, given the substantial evidence supporting the first degree murder verdict, it was reasonable for the California Court of Appeal to conclude there was no reasonable probability of a different result if counsel had requested that the prior domestic violence instruction be modified.

     5.    <u>Failure To Further Object To Some Domestic Violence Evidence</u>

     Mr. Maldonado contends that counsel was ineffective in that he failed to object that some evidence of prior domestic violence sought to be admitted under California Evidence Code section 1109 was inadmissible because it was hearsay and section 1109 does not establish a hearsay exception.  Docket No. 6 at 48, 51.

     Pursuant to California Evidence Code section 1109, evidence of Mr. Maldonado's past episodes of domestic violence toward Ms. Moore was admitted at trial.  The prosecutor moved *in limine* to admit evidence of several prior acts of domestic violence committed by Mr. Maldonado against Ms. Moore.  This evidence included some hearsay statements from Ms. Moore.  Defense counsel made a hearsay objection to the evidence, but the trial court did not sustain that objection.  RT 43-46, 81, 89-90.  Mr. Maldonado faults counsel for failing to make the further objection that California Evidence Code section 1109 did not create a hearsay objection.  After the *in limine* hearing, the trial court determined that five incidents were admissible:

> Incident No. 1: a late February or early March 2010 incident where Moore's father saw her with a swollen lip. When Moore's father asked her about the injury, Moore said appellant had accidentally bumped her. Moore's father confronted appellant, saying, "You hit her. Don't ever hit my daughter. You touch her again, you've gotta deal with me." Appellant did not deny the claims or argue with Moore's father. The prosecutor argued appellant's response to Moore's father's accusations was relevant and was an adoptive admission. Appellant objected to this evidence, arguing Moore's father was "speculating" on what happened, and that the evidence lacked foundation, and was irrelevant and inflammatory under Evidence Code section 352. The court concluded appellant's failure to "deny anything" was an adoptive admission.

> Incident No. 5: an April 2010 incident where Moore told Wilson appellant threw a coffee cup at a sliding glass door during an argument, breaking the glass. The court initially excluded the evidence but later allowed Wilson to testify appellant "threw a coffee cup" over defense counsel's hearsay objection.

Incident No. 6: an April 2010 incident when Moore told Elletson she and appellant had "'gotten into it,'" and appellant gave Moore a black eye. One of Moore's co-workers noticed the black eye. Moore told Elletson she was embarrassed by the black eye, and had not gone to work because of it. Moore's co-worker noticed a black eye around the same time. Moore was fired for not going to work. The court noted the evidence was "physical abuse ... statements from the victim, closeness in time" and in response, trial counsel "[s]ubmitted." The court then admitted the evidence.

Incident No. 8: a May 2010 incident, when Elletson heard appellant and Moore arguing in her bedroom. After hearing a smack, Elletson ran into the bedroom and saw Moore holding her cheek. When she asked appellant, "'Did you put hands on her[,]'" appellant denied hitting Moore, but Moore told Elletson appellant had slapped her. The court noted, "that seems [to be a] pretty clear case of domestic violence and a domestic violence act that has corroboration.... And then subsequently the victim does confirm and the defendant makes a denial and takes off." Appellant's counsel "object[ed] and submit[ted]."

Incident No. 10: a late April 2010 incident where Frey and Moore were in Moore's room and Moore complained that "[her] back hurt" and Frey asked her why it hurt. Moore told him appellant punched her in the back and showed Frey a bruise the size of two baseballs. Defense counsel argued, "I don't think it's corroborated; it's hearsay of the witness, who is obviously a very biased witness in this case." The court concluded the evidence was admissible under Evidence Code section 1109 and was not inadmissible under Evidence Code section 352, noting it would not confuse the issues and was "clearly not as inflammatory as being stabbed to death."

Cal. Ct. App. Opinion at 18-19.

The California Court of Appeal "assume[d] for the sake of argument the court erred by admitting the challenged evidence," but concluded that any error was harmless even if the evidence had been excluded. Cal. Ct. App. Opinion at 20. The error was harmless because "there was ample evidence from which the jury could determine appellant killed Moore with premeditation and deliberation including evidence that appellant: (1) had a motive to kill Moore; (2) walked to and from the kitchen to retrieve the murder weapon; (3) hid the murder weapon and fabricated a story about how Moore was stabbed; and (4) left Moore threatening voicemails." *Id.* Further, as Mr. Maldonado had conceded, even with exclusion of Ms. Moore's alleged hearsay statements of what had occurred, the jury still would have heard the non-hearsay evidence of past domestic violence. The California Court of Appeal did not separately discuss the ineffective-assistance-of-counsel claim related to the domestic violence evidence.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

Because the state appellate court rejected the ineffective assistance of counsel claim without discussion, this Court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court." *Harrington,* 562 U.S. at 102.

The state appellate court reasonably could have determined that the ineffective-assistance claim failed on the prejudice prong of a *Strickland* analysis. That is, the state court reasonably could have concluded that there was no reasonable probability of a different result if counsel had further argued his hearsay objection. Even if the objection had been sustained and the jury did not learn of Ms. Moore's statements about Mr. Maldonado's acts of domestic violence, the jury nonetheless would have learned (from testimony other than witnesses relaying Ms. Moore's hearsay statements) that Mr. Maldonado "threw a cell phone at Moore, split open her lip, broke her car window with his hand because he was 'mad,' and gave Moore a black eye." Cal. Ct. App. Opinion at 20. The jury would have learned of multiple instances of past violence by Mr. Maldonado against Ms. Moore, even without her explanations and rationalizations about that violence. As noted above, Maldonado had conceded that, even with exclusion of Ms. Moore's alleged hearsay statements of what had occurred, the jury still would have heard the non-hearsay evidence of past domestic violence. Further, the other evidence of first degree murder was strong, as discussed in § E.1, above. The California Court of Appeal's rejection of Mr. Maldonado's ineffective-assistance claim was not contrary to or an unreasonable application of *Strickland*.

6.   Failure to Inquire Whether Mr. Maldonado Wanted To Testify

Mr. Maldonado contends that his trial counsel was ineffective in not calling him to testify as a witness. During a mid-trial conference about the jury instructions, at which Mr. Maldonado was present, trial counsel said that Mr. Maldonado would not be testifying at trial. RT 1201. Mr. Maldonado did not protest then and did not protest when the defense rested without him testifying. RT 1201, 1261.

This claim was not presented on direct appeal and instead was presented only in Mr. Maldonado's *pro se* petition for writ of habeas corpus to the California Supreme Court, where it

was rejected without discussion.  Because the California Supreme Court summarily rejected the claim, the federal habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court."  *Harrington,* 562 U.S. at 102.

"The *Strickland* standard is applicable when a petitioner claims his attorney was ineffective by denying him his constitutional right to testify."  *Matylinsky v. Budge,* 577 F.3d 1083, 1097 (9th Cir. 2009); *see Gulbrandson v. Ryan*, 738 F.3d 976, 989 (9th Cir. 2013).  That is, the petitioner must show both deficient performance and prejudice under *Strickland* to obtain relief on a claim that his attorney was ineffective in not putting the petitioner on the witness stand.

The California Supreme Court reasonably could have determined that trial counsel's decision not to call Mr. Maldonado to testify was not deficient performance because Mr. Maldonado did not indicate to counsel or the trial court that he wanted to testify.  "Although the ultimate decision whether to testify rests with the defendant, he is presumed to assent to his attorney's tactical decision not to have him testify. . . . [I]f the defendant wants to testify, he can reject his attorney's tactical decision by insisting on testifying, speaking to the court, or discharging his lawyer.  Thus, waiver of the right to testify may be inferred from the defendant's conduct and is presumed from the defendant's failure to testify or notify the court of his desire to do so."  *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993); *United States v. Pino-Noriega*, 189 F.3d 1089, 1095 (9th Cir. 1999).  Here, Mr. Maldonado remained silent when his attorney reported to the court that Mr. Maldonado would not be testifying and remained silent when counsel rested the defense without Mr. Maldonado testifying.  There is no evidence that he demanded that counsel let him testify.  Also, Mr. Maldonado advanced no such claim on appeal.  The California Supreme Court reasonably could have determined that counsel did not engage in deficient performance because, by not informing his attorney of his desire to testify and by remaining silent when counsel announced to the court that Mr. Maldonado would not testify, Mr. Maldonado assented to the attorney's decision not to call him as a witness.  Mr. Maldonado does not contend he was given bad advice by counsel to not testify.

United States District Court
For the Northern District of California

1   The California Supreme Court also reasonably could have determined that trial counsel's

2   decision not to call Mr. Maldonado to testify was not deficient performance and did not result in

3   prejudice because Mr. Maldonado would have been a poor witness for the defense.  Any positive

4   testimony he could have provided would have been greatly outweighed by the damage done to the

5   defense during cross-examination.  *See Matylinsky*, 577 F.3d at 1097 (state court was not

6   unreasonable in finding no prejudice from counsel's failure to allow defendant to testify because

7   the testifying defendant "would have been subjected to damning cross-examination on his prior

8   convictions" and jury would have observed the defendant's "general disinterested nature" and

9   effort to blame his wife for instigating the fight that led to her death); *Gulbrandson*, 738 F.3d at

10  989 ("counsel could have reasonably concluded that Gulbrandson's testimony would have harmed

11  the defense because it could have 'alienated him in the eyes of the jury," given the defendant's

12  statements indicating that his conduct was a justifiable response to his wife's efforts to reap the

13  profits from a business he had developed and defendant's statements that his wife was

14  argumentative, hostile and disrespectful to him on the night he beat and stabbed her to death).

15  The story Mr. Maldonado wanted to tell the jury was of little value to the defense as he

16  claims not to remember what actually happened in the crucial moments.  Mr. Maldonado states:

17  "Before the incident, petitioner had like a dream that Katrina [Moore] was arguing with petitioner.

18  Then Katrina was chasing petitioner with a knife.  And then Katrina and petitioner had a struggle,

19  and during the struggling, Katrina was stabbed."  Docket No. 6 at 10; Docket No. 14 at 10; *see*

20  also Docket No. 13-22 at 127 ("petitioner wanted to tell the jury that during his dream due to the

21  methamphetamine consumption, he thought that before the stabbing, he and Katrina were arguing

22  and Katrina was hitting petitioner all over his body.  And after that, Katrina was chasing him with

23  the knife.  And the[n] they had a struggle[] and [it] was during that struggle that Katrina was

24  stabbed."); Docket No. 13-22 at 125 ("Petitioner was too drugged on methamphetamine to

25  remember what really occurred near the stabbing of Katrina").  Even at this late date, Mr. Moore

26  doesn't make it clear whether his version is that he stabbed Ms. Moore due to a drug-induced

27  dream that he needed to kill her to avoid being killed, or that he has a fuzzy dreamlike recollection

28  of the stabbing and events leading up to it, or something else.  The jury would be highly likely to

**United States District Court**
For the Northern District of California

1   reject Mr. Maldonado's incomplete and jumbled story, especially because the story does not

2   explain how Ms. Moore came to have the very deep knife wound: Mr. Maldonado neither

3   acknowledges that he stabbed her, nor does he take the position that she stabbed herself.  The

4   knife had been plunged into her chest about eight inches, RT 909, and Mr. Maldonado does not

5   explain how such a deep wound would have occurred during his struggle with Ms. Moore.  Not

6   only was his story incomplete and jumbled, being on the witness stand would have opened him up

7   to substantially damaging cross-examination.  The prosecution would have shown through cross-

8   examination that any alleged drug-induced state was inconsistent with Mr. Maldonado having the

9   presence of mind to try to hide the knife before seeking help -- an especially damaging area

10  because the pathologist testified the victim might have survived had Mr. Maldonado summoned

11  aid for her more quickly.  *See* RT 912-14.  And the prosecution would have cross-examined him at

12  length about his made-up story that Ms. Moore had been cut with a shard of the mirror that broke

13  when she fell into it, and the fact that he only abandoned that story after the knife was found in the

14  floor vent.  Mr. Maldonado would have been subjected to cross-examination about what appeared

15  to be an effort to fabricate a defense in conversations with his relatives.  Mr. Maldonado also

16  would have been subjected to intense cross-examination about the several incidents of domestic

17  violence, as to which he would have a very difficult time putting himself in a positive light.  With

18  these numerous downsides and almost no upside to Mr. Maldonado testifying, the California

19  Supreme Court reasonably could have determined that counsel did not engage in deficient

20  performance and no prejudice resulted when counsel chose not to put Mr. Maldonado on the

21  witness stand.

22       Taking a "'highly deferential' look at counsel's performance," through § 2254(d)'s

23  already "'deferential lens,'" *Cullen v. Pinholster*, 563 U.S. at 190, it cannot be said that the

24  California courts' rejection of any of the several ineffective assistance of counsel claims was

25  contrary to or an unreasonable application of *Strickland*.  Mr. Maldonado is not entitled to relief

26  on any of his ineffective assistance of counsel claims.

27  F.    Cumulative Error Claim

28       Mr. Maldonado contends that the cumulative effect of several errors in his case support

1    habeas relief.

2           In some cases, although no single trial error is sufficiently prejudicial to warrant relief, the

3    cumulative effect of several errors may still prejudice a defendant so much that his conviction

4    must be overturned.  *See Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir.  2003).

5           Here, only a few claims were rejected solely on the ground that the error was harmless or

6    that *Strickland* prejudice was not found.  Those claims were the claims that (a) counsel misstated

7    the distinction between murder and manslaughter (*see* § E.3); (b) counsel failed to seek

8    modification of CALCRIM 852 on the use of domestic violence to show propensity to commit

9    manslaughter as well as murder (*see* § E.4); and (c) counsel failed to object that California

10   Evidence Code section 1109 did not provide an exception to the hearsay rule (*see* § E.5).  In each

11   of these three claims, deficient performance was found or assumed to exist, and the claim was

12   rejected on the prejudice prong of *Strickland*.

13          This Court has considered the cumulative impact of these three alleged deficiencies of

14   counsel because "'prejudice may result from the cumulative impact of multiple deficiencies.'"

15   *Harris v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995) (quoting *Cooper v. Fitzharris*, 586 F.2d 1325,

16   1333 (9th Cir. 1978) (en banc)).  In other words, in a case with multiple instances of deficient

17   performance, there may be a reasonable probability that, absent the various deficiencies, the

18   outcome of the trial might well have been different.  To consider the overall impact, one considers

19   only the instances where deficient performance has been found and does not consider instances

20   where deficient performance has not been found.  In other words, lots of non-mistakes cannot be

21   added together to find prejudice.  Here only the three claims identified in the preceding paragraph

22   were rejected solely on the prejudice prong and not also on the deficient performance prong.  Even

23   when viewed in the aggregate, these three instances of purportedly deficient performance did not

24   result in prejudice.  That is, there is no reasonable probability that the result of the proceeding

25   would have been different if counsel had not misstated the distinction between murder and

26   manslaughter, had not failed to seek modification of CALCRIM 852, and had not failed to object

27   that California Evidence Code section 1109 did not provide an exception to the hearsay rule.

28   Regardless of these errors, the inescapable facts are that the heat of passion evidence was very,

United States District Court
For the Northern District of California

43

1  very weak and the nonhearsay evidence amply showed substantial prior domestic violence by Mr.

2  Maldonado against Ms. Moore.  There was substantial evidence of a premeditated and deliberate

3  stabbing by Mr. Maldonado.

4        Mr. Maldonado is not entitled to relief under the cumulative error doctrine.

5  G.    Ineffective Assistance of Appellate Counsel

6        Finally, Mr. Maldonado argues that appellate counsel was ineffective in that counsel failed

7  to raise on direct appeal his arguments that:  (1) the evidence was insufficient to support the

8  verdict, (2) the trial court erred in refusing to instruct on voluntary intoxication, and (3) trial

9  counsel was ineffective in failing to call Mr. Maldonado as a witness.  *See* Docket No. 6 at 6-21.

10        This claim for ineffective assistance of appellate counsel was presented only in Mr.

11  Maldonado's *pro se* petition for writ of habeas corpus to the California Supreme Court.  Because

12  the California Supreme Court summarily rejected the claim, the federal habeas court "must

13  determine what arguments or theories supported or . . . could have supported, the state court's

14  decision; and then it must ask whether it is possible fairminded jurists could disagree that those

15  arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme]

16  Court."  *Harrington,* 562 U.S. at 102.

17        The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the

18  effective assistance of counsel on his first appeal as of right.  *See Evitts v. Lucey*, 469 U.S. 387,

19  391-405 (1985).  Claims of ineffective assistance of appellate counsel are reviewed according to

20  the standard set out in *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  A defendant must

21  show that appellate counsel's advice fell below an objective standard of reasonableness and that

22  there is a reasonable probability that, but for counsel's unprofessional errors, he would have

23  prevailed on appeal. *Miller v. Keeney*, 882 F.2d 1428, 1434 & n.9 (9th Cir. 1989).  Appellate

24  counsel does not have a constitutional duty to raise every nonfrivolous issue requested by a

25  defendant.  *See Jones v. Barnes*, 463 U.S. 745, 751-54 (1983).  The weeding out of weaker issues

26  is widely recognized as one of the hallmarks of effective appellate advocacy.  *See Miller*, 882 F.2d

27  at 1434; *see also Jones*, 463 U.S. at 751-52.

28        Mr. Maldonado is not entitled to habeas relief on his claim that appellate counsel provided

**United States District Court**
For the Northern District of California

44

ineffective assistance of counsel.  This Court has concluded that the omitted claims lack merit.  Appellate counsel's decision not to include the nonmeritorious claims in the appellate brief is a classic example of effective appellate advocacy.  The 90-page appellate brief was quite long without the unmeritorious claims, so it was a wise strategy to omit them-- especially the challenge to the sufficiency of the evidence.  Further, because the claims were not meritorious, there was no reasonable probability that Mr. Maldonado would have prevailed on appeal if the claims had been presented in the direct appeal.  Mr. Maldonado is not entitled to the writ on this claim.

H.      No Certificate of Appealability

        A certificate of appealability will not issue.  *See* 28 U.S.C. § 2253(c).  This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Accordingly, a certificate of appealability is **DENIED**.

## VI.      CONCLUSION

        For the foregoing reasons, the petition for writ of habeas corpus is **DENIED** on the merits.  The Clerk shall close the file.


        **IT IS SO ORDERED**.


Dated: March 29, 2017

_____
EDWARD M. CHEN
United States District Judge

United States District Court
For the Northern District of California